IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF COLUMBIA

**MOBILE NOW, INC.**
    c/o Sean Patrick Roche, Esq.
    CAMERON/MCEVOY, PLLC
    4100 Monument Corner Drive, Suite 420
    Fairfax, Virginia 22030

       Plaintiff,

v.
                             CIVIL ACTION NO. 1:19-cv-00918

**SPRINT CORPORATION d/b/a**
**SPRINT SOLUTIONS, INC.**
    Serve:
    Corporation Service Company – Registered Agent
    1090 Vermont Ave., N.W.
    Washington, DC 20005

       Defendant.

## COMPLAINT

COMES NOW Plaintiff Mobile Now, Inc. ("Plaintiff" or "Mobile Now"), by counsel, and for its Complaint against the Defendant Sprint Corporation d/b/a Sprint Solutions, Inc. ("Defendant" or "Sprint"), alleges as follows:

## NATURE OF THE ACTION

1.    Mobile Now was an authorized representative for Sprint in the sale of Sprint-branded telecommunications products.  As Sprint and T-Mobile US, Inc. close-in on a multi-billion-dollar merger which will undeniably shake-up the already monopolistic telecommunications industry, Sprint has engaged in a sudden campaign to dismantle Mobile Now and shed nearly 100 retail locations and terminate nearly 500 employees.  As this Complaint is being drafted, Mobile Now is quickly dying as a viable business.  This lawsuit is an attempt to gain the Court's assistance in holding Sprint to the damages it has caused.

169911 - v1

**THE PARTIES**

2.      Mobile Now is a Virginia corporation with its principal place of business located at 8484 Westpark Drive, Suite 800, McLean, Virginia 22102.

3.      Mobile Now operates three Sprint-branded retail stores within Washington, DC and conducts substantial business in Washington, DC.

4.      As a result of Sprint's actions, detailed herein, all three of Mobile Now's Washington, D.C. retail locations were recently forced to close.

5.      Sprint is a Delaware corporation with its principal place of business located at 6200 Sprint Parkway, Overland, Kansas 66251.

6.      Sprint is an entity which conducts business throughout the United States and internationally.  Sprint's own cell phone network coverage maps indicate it conducts business in every state in the United States and the District of Columbia.

7.      At all relevant times to this action, Sprint has conducted substantial business in Washington, DC through Mobile Now and other authorized resellers, and it maintains a registered agent in DC for service of lawsuits related to its authority to conduct business in DC.

**JURISDICTION AND VENUE**

8.      The Court has subject matter jurisdiction over the claims asserted in this action by virtue of complete diversity of citizenship among the parties pursuant to 28 U.S.C. §1332 and the amount in controversy exceeds $75,000.00.

9.      The Court has personal jurisdiction over Sprint because it conducts substantial business within Washington, DC (and within the geographic jurisdiction of this Court) and it has committed acts resulting in damage within Washington, DC and this judicial district.

Accordingly, this Court has personal jurisdiction over Sprint, and venue is proper here pursuant to 28 U.S.C. § 1391(b) and (c).

## BACKGROUND

### Mobile Now and Its Business.

10.     Mobile Now is a wireless telecommunications distributor, selling Sprint-branded telecommunications products, services, and accessories through brick and mortar retail locations, e-commerce, cable television, and mobile phone business channels.

11.     Mobile Now was formed in 2009 to work exclusively with what is now Sprint.

12.     Mobile Now is a family business which grew to be one of the largest multi-channel wireless distributors in the country.

### Consolidation Within the Telecommunications Industry and Mobile Now's Relationship with Sprint

13.     From the period of 2003 through the present, the telecommunications industry underwent significant consolidation, with many of the smaller localized wireless service providers gobbled up by huge mega-companies currently known as Verizon, AT&T, T-Mobile, and Sprint ("The Big Four").

14.     Verizon and AT&T are generally regarded as the two largest wireless carriers in the United States, with T-Mobile currently regarded as the third largest and Sprint regarded as the fourth largest.  While there remain some smaller "Mobile Virtual Network Operators" or "MVNOs" that account for a small percentage of wireless subscribers, reference to MVNOs is misleading in terms of trying to depict that the telecommunications industry may be more competitive than it is.  MVNOs do not actually own any wireless network infrastructure. Instead, an MVNO effectively rents bulk access to network services from a mobile network operator ("The Big Four") at wholesale rates and then re-sells that access at retail prices.

15.     The misleading aspect of reference to MVNOs is that with few limited exceptions, The Big Four control MVNO access, pricing, and network operation.[1]

16.     With each new round of consolidation over the years, the contractual restrictions placed on distributors such as Mobile Now have increased, with ever more onerous contracts that often include heavily one-sided clauses.  Distributors have little to no leverage to negotiate or reject contractual obligations and contract modifications usually arrive coupled with threats of withholding much needed commission payments or other amounts owed should a distributor protest the contract amendments.

17.     As industry consolidation occurred, Verizon, AT&T, T-Mobile, and Sprint all knew that contractual "negotiations" were really not negotiations at all.  Distributors were often saddled with exclusivity clauses that limited any ability to negotiate, infrastructure obligations such as store leases eliminated any option to simply walk away from contract negotiations, and the extremely limited pool of wireless carriers after significant consolidation left no alternative bargaining partners.

### Sprint/T-Mobile Merger and the Wrongful Conduct of Sprint

18.     T-Mobile and Sprint have danced around merger talks for years, including spending months negotiating a merger throughout 2017 only to cancel merger talks in late 2017.

19.     In early 2018, T-Mobile and Sprint renewed merger talks with much speculation as to whether a merger would be negotiated and if such a merger would ever be granted

---

[1] Stated differently, the major difference between mobile network operators like Verizon, AT&T, T-Mobile, and Sprint and an MVNO, is that mobile network operators own/control: (1) access to a radio spectrum license from regulatory/governmental entities; and (2) the elements of a network infrastructure capable of providing cell phone service to subscribers over the licensed spectrum.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron McEvoy
PLLC

regulatory approval given the size of the two entities and the limited competitive telecommunications marketplace that already existed.

20.     Throughout this same time period in 2017 and early 2018, Sprint began to openly and aggressively impose new contractual terms upon its distributors, such as Mobile Now.

21.     Mobile Now is one of the largest Sprint distributors within the United States, accounting for approximately 5% of Sprint's indirect retail sales.

22.     In early 2018, Sprint owed Mobile Now approximately $4,100,000.00, a large amount of money for any-size distributor and a crippling amount of money to not be paid in the razor-thin margin industry of telecommunications.

23.     Sprint refused to pay the $4.1m until Mobile Now signed a new "Authorized Representative Agreement" which clearly was drafted in anticipation of the T-Mobile/Sprint merger.  The new Agreement contained one-sided clauses which gave Sprint broad authority to escape from the Agreement and even change material terms of the Agreement after the fact while hand-cuffing any distributor's ability to compete with any post-merger Sprint entity.

24.     The apparent rationale behind these heavy-handed negotiating tactics was that Sprint realized its continued existence was short-lived and that the substantial retail overlap between T-Mobile and Sprint would require Sprint to have broad contractual authority to wipe out much of its indirect retail business distribution line just prior to (or just after) merger approval.

25.     Mobile Now initially refused to sign the contract that Sprint was requiring its distributors to sign.  Mobile Now viewed the contract as grossly unfair and inequitable.

26.     At the time of late 2017 and early 2018, Mobile Now operated roughly 100 brick and mortar retail stores with Sprint-branding located up and down the East Coast and throughout

the Midwest.  Those stores and the Mobile Now headquarters employed roughly 500 employees, consisting primarily of retail employees.

27.     After months of not receiving monies owed to the company and ultimately accounting for its employees' jobs, Mobile Now management buckled to Sprint's pressure to sign Sprint's new "Authorized Representative Agreement."  On March 21, 2018, Mobile Now signed Sprint's Authorized Representative Agreement ("Sprint Agreement") and the following day, March 22, 2018, Mobile Now signed the accompanying Addendum required by Sprint ("Sprint Addendum").

28.     A true and correct copy of the Sprint Agreement is attached and incorporated herein by reference as Exhibit 1.[2]

29.     A true and correct copy of the Sprint Addendum is attached and incorporated herein by reference as Exhibit 2.

30.     On April 29, 2018, T-Mobile and Sprint announced plans to merge and further consolidate the telecommunications industry down from four carriers to just three.

31.     Unlike many similar merger attempts, Sprint has no "merger breakup fee" such that once it agreed to the merger, Sprint knew it would start to shed customers hesitant to sign with an entity that could disappear, yet the lack of a breakup fee means it is motivated to make sure the merger is approved.[3]

---

[2] All Exhibits to this Complaint are being filed under seal to allow Sprint an opportunity to review the Exhibits and consult with the undersigned as to what, if any, documents, the parties can agree to file publicly.

[3] Ironically, much of the recent success of T-Mobile is attributed to the "merger breakup fee" it received when its attempted merged with AT&T failed years ago.

32.     Sprint's need to gain merger approval coupled with its need to plan for substantial layoffs in its retail business required it to diminish distributor relationships with inequitable/unconscionable contracts.

33.     To industry entities like Mobile Now, who operate on razor-thin margins driven down by lack of competitive options, the merger announcements caused a collective shudder in light of the inevitable layoffs that would follow and the further tightening of the noose in terms of an ability to negotiate equitable employment and contractual terms.

34.     Moreover, as merger plans were announced, Mobile Now began to actively hear from sources within Sprint that Mobile Now's refusal to immediately sign the Sprint Agreement and Sprint Addendum had led to open hostility towards Mobile Now within Sprint.

35.     While the Sprint Agreement and Sprint Addendum were drafted by a team of in-house lawyers within Sprint and Sprint attempted to insert an arbitration clause, the arbitration clause fails for many reasons:

   a. First, as will be detailed further below, Sprint has manufactured a "termination for cause" of the Sprint Agreement and Section 14.3 of the Sprint Agreement provides that in the event of a termination for cause, Mobile Now may not "resort to the dispute resolution process set forth in Exhibit E," literally requiring Mobile Now to file suit to challenge or recover damages for a wrongful termination for cause.

   b. Second, as will be detailed further below, Sprint elected to delay its termination for cause to an effective date of April 18, 2019, and Section 14.7 of the Sprint Agreement provides:

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030

TEL 703.273.8898   FAX 703.273.8897

i.  "[Mobile Now] has no right to initiate the dispute resolution process set forth in Exhibit E to dispute Sprint's right to terminate the Agreement, even if [Mobile Now] disputes the basis or propriety of the termination," again leaving the courts as the only forum for a remedy; and

ii.  "It is expressly understood by [Mobile Now] that the dispute resolution process set forth in Exhibit E may only be invoked in a termination **after the termination has gone into effect**," meaning that when Sprint unilaterally delays a termination but in the meantime puts a distributor out of business, the distributor's only remedy in the meantime is to file suit, as Mobile Now has done here.[4]

c.  Third, the Sprint Agreement includes a "survival" clause that lists various clauses that survive termination but glaringly omits the "Exhibit E – Dispute Resolution" provisions.[5]  *See* Exhibit 1, at § 18.11.

d.  Last, Exhibit E to the Sprint Agreement is riddled with inconsistencies and one-sided provisions which cleverly do not impose any obligation upon Sprint which renders the entire Exhibit E void as lacking in mutuality, particularly when coupled with the above cited language carving out Exhibit E from

---

[4] Exhibit E to the Sprint Agreement, Section 1, contains similar language excluding Exhibit E's availability prior to any effective date of a termination.

[5] It must be noted that Exhibit E contradicts this omission within Section 7 of Exhibit E ("The provisions of Exhibit E will continue in full force and effect after the expiration or termination of this Agreement") but the lack of an "adverse construction" or "contra proferentum" clause means that if this is deemed an ambiguity within Sprint's contract then it should be interpreted against Sprint.

applying to terminations for cause or applying to disputes filed before the effective date of a termination. *See* Exhibit 1, at Exhibit E.  For example:

    i.   Exhibit E provides within its Section 3 that: "A Party may only pursue a Dispute that is not resolved through mediation by filing an arbitration.  [Mobile Now] may not commence arbitration until a Dispute has been subject to mediation . . . ."  As such, Mobile Now has no right to invoke Exhibit E's arbitration process until a mediation occurs.  The glaring problem with Sprint's language inserted here, and a common problem with aggressively one-sided contracts, is that in Section 2 only Sprint is authorized to invoke the mediation provisions. Meaning, so long as Sprint elects never to require mediation, Mobile Now has no ability to pursue arbitration.  Exhibit E is entirely illusory and void for lacking in mutuality as Sprint's language, whether intentional or accidental, allows it to avoid dispute resolution altogether by simply doing nothing which is not a valid contract supported by mutuality of obligation.

36.    In the months after the merger announcement, Sprint began to suffer widespread migration of customers to other carriers, which is customary with merger news as customers are hesitant to stay with an entity that no longer plans to exist in the near future.

37.    In an effort to prop up sales, Sprint sales personnel became ever-more aggressive with sales demands and requirements.  In fact, part of the motivation behind the Sprint Agreement was to impose stricter performance requirements upon distributors and tighten the requirements for commission payments to make distributors work harder for less pay.

38.     As part of Sprint's efforts to bolster slumping sales and a plummeting stock price, Sprint began to push a "spiff"[6] or "bonus" package called "Non-Handset Revenue" which included sales for: Sprint Complete (Sprint's handset insurance plan), tablets, watches, Sprint Drive (Sprint's roadside assistance and vehicle diagnostics program), and Value Added Services ("VAS") that included Sprint's Safe and Found program (GPS tracking and parental control) and its Lookout program (mobile phone security and ID theft protection).

39.     Most notably, in November 2018, Sprint began to actively push and market the "Safe and Found" and "Lookout" programs as ways to increase revenue.  As a way to roll this out and encourage sales, Sprint issued a "scorecard" ranking the distributors in how well they were pushing the two programs to consumers.  The programs were explained to distributors as programs that should be pushed on all new accounts as they were initially free for a trial period.

40.     From November 2018 through March 2019, Mobile Now followed Sprint's direction and informed all staff that they were to push the new VAS programs to all new accounts.

41.     As stated, on March 19, 2019, Sprint issued a notice of termination "for cause pursuant to Section 14.3(A) of the Agreement."  ("Termination Notice").   The Termination Notice went on to allege that:

> "[Mobile Now's] leadership has directed its employees to 'slam' Customers by adding services, including Sprint Lookout Premium Plus Security and Sprint Safe & Found, to Customer accounts without the Customer's knowledge or verification. Sprint has identified thousands of suspicious Customer transactions related to Mobile Now. In addition, [Mobile Now] has utilized a single employee account in multiple states, simultaneously, to bypass ID Scan requirements. Such actions indicate a systemic and

---

[6] The origins of the term "spiff" in terms of a sales commission are unknown but the history is interesting:  https://en.wikipedia.org/wiki/Spiff.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

widespread falsification of information and fraudulent activities
against both Sprint and Sprint's customers."

42.    A true and correct copy of the Termination Notice is attached as Exhibit 3 and incorporated herein by reference.

43.    The Termination Notice delayed the effective date of the termination until April 18, 2019, revealing that Sprint was not truly concerned with Mobile Now as a continuing distributor.

44.    In short, the Termination Notice accused Mobile Now of fraud and falsifying information on two grounds: (1) "slamming" customers by applying the referenced programs to customer accounts without customer knowledge or verification; and (2) using a single account to bypass ID Scan requirements.  Neither one of the above rationale for termination constitute fraud or false information, even if true.

45.    Instead, Sprint was motivated to manufacture a termination for cause for one or all of the following reasons:

    a.    Termination for cause allows Sprint to invoke a liquidated damages clause against Mobile Now and with T-Mobile's CEO actively predicting merger approval by June 2019,[7] Sprint has only a couple months left to find a reason for a termination for cause to bolster pre-merger financials.

    b.    Termination for cause accomplishes Sprint's inevitable requirement under the merger to shed a huge number of retail stores by literally killing Mobile Now as an entity.

---

[7]    *See, e.g.*, https://www.multichannel.com/news/t-mobiles-legere-confident-sprint-deal-approved-by-june (serving as one of many examples of news reports that T-Mobile's CEO is predicting approval of the merger by June 2019).

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898    FAX 703.273.8897

CAMERON | McEvoy

c.   Termination for cause allows Sprint to withhold payments after the effective
date of any termination owed to Mobile Now, currently totaling in excess of
$10,000,000.00 for a "minimum of 210 days" with no deadline on when/if
that payment will be paid and with the reality that Mobile Now will be a dead
entity long before the "minimum of 210 days" for which it intends to withhold
final payments and which presumably extends well past when T-Mobile (and
presumably Sprint) believe the merger will be approved.

d.   Termination for cause helps Sprint avoid the brewing concern that at least
30,000 jobs will be lost, largely within the ranks of distributors like Mobile
Now, from the merger.  If Sprint can thin its number of distributor employees
prior to serious merger consideration, or terminate as many distributors for
"cause" prior to serious merger consideration, the eventual job loss statistics
will appear artificially low.

46.     With regard to the specifics of the Termination Notice, it is clear that the
Termination Notice is manufactured and/or pretextual to achieve one or all of the above goals.
The problem is that the Termination Notice renders a business with a conservative valuation of
somewhere around $50,000,000.00 as a dead entity, nearly overnight, particularly in the strategic
manner in which it was done.

47.     For example, the Termination Notice claims "fraud" as a basis for the termination
yet there is nothing within the Termination Notice or anything that has been disclosed in the time
since receipt of the Notice that is remotely clause to the legal definition of fraud (i.e.,
misrepresentation of a material fact upon which the party relies causing damage).  In fact, there's
zero reference to any representation, let alone a misrepresentation.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron | McEvoy
PLLC

48.     Similarly, there is no detail as to what "false information" Sprint is relying upon for such a drastic remedy of termination for cause.  There is nothing detailed in the Termination Notice that indicates anything was done that was untrue (i.e., false) so the reliance upon "falsification of information" is wrong at best, defamatory at worst, and ironically, false no matter what.

49.     At one point in the Termination Notice Sprint references the term "slam" as a basis for the termination.  Slam is a word that has many meanings though it appears Sprint is accusing Mobile Now of the illegal practice of changing a telephone carrier without a user's consent (known in the telecommunications industry as "slamming").  No part of the Termination Notice refers to the changing of a telephone carrier without a user's consent so use of "slam" and relying upon that as a basis for the Termination Notice is clearly misplaced, improper, and/or, again, false.

50.     While the reference to "slamming" is clearly misused as Mobile Now has no ability to engage in "slamming" (only a carrier would have that ability), presumably, Sprint intended to reference the term "cramming" which is the illegal practice of applying charges to a telephone customers account without their consent.  Even that, however, cannot apply as Sprint's own communications and policies verify that the "Safe and Found" and "Lookout" programs in question are free from the start and only can be charged upon receipt of a text by the end-user, a process that is completely within Sprint's control and management.  Thus, even if Sprint intended to manufacture a termination based upon purported cramming (not slamming), even that use would be misplaced, improper, and/or false.

51.     The Termination Notice goes on to accuse Mobile Now of a violation of Sprint's ID Scan policy.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron McEvoy
PLLC

52.     A true and correct copy of the Sprint ID Scan policy in effect as of March 19, 2019 is attached as Exhibit 3 and incorporated herein by reference.

53.     The intent of the ID Scan policy is to protect against ID theft and ensure that the individual purporting to buy a Sprint product at a distributor's point of sale is in fact the person they claim to be.   In short, the ID Scan policy requires review (and if possible electronic scanning verification) of a government-issued ID prior to sale of any product to a customer. Sprint purports to indicate in the Termination Notice that Mobile Now engaged in an improper ID Scan bypass, a procedure in which account-access is obtained without scanning an ID.   In fact, Mobile Now had broad authority under the ID Scan policy to bypass any ID scan requirement and while Sprint now pretends it stringently enforces the ID Scan policy, the reality is that Sprint does not.   For example, Sprint even goes so far as to maintain statistics of distributor ID scan bypass by way of an update to distributors which shows the "bypass-rate" of each distributor.

54.     All Sprint distributors have an ID scan bypass rate above 0.0%, with most hovering somewhere between 10% and 30% for all transactions.   Some distributors approach 50% in terms of not scanning an ID prior to account access.

55.     Moreover, upon closer review of the Sprint ID Scan policy, nothing within that policy supports the allegations in the Termination Notice.   In fact, the ID Scan drafted and prepared exclusively by Sprint (and therefore legally interpreted against Sprint), expressly and broadly provides that: "ID Scan bypass may be utilized with sales management consent."   *See* Exhibit 4, at 1 (the relevant portion on Page 1 has been highlighted though the highlighting has been added for easy reference – highlighting on Page 2 is contained in the original).   The Termination Notice expressly alleges that the ID Scan bypass was authorized by "AR's

leadership," apparently forgetting that Sprint's ID Scan policy expressly allows bypass by "sales management" which would necessarily include "AR's leadership."[8]

56.     Sprint also seems to forget that it was actively telling distributors to roll out the "Value Added Services" of "Safe and Found" and "Lookout" to all new customers.

57.     Sprint also forgets that it had provided Mobile Now with certain codes authorized to circumvent Sprint ID scan bypass requirements in order for customer escalations, customer discounts, and gaining account access, among other things.  This is verified by Sprint statistics showing Sprint not only knew of use of the code but actively tracked its used and even forwarded statistics of its use back to Mobile Now without ever objecting to its use.  For example, according to Sprint documentation, the very same employee code referenced in the Termination Notice was used 502 times across 56 store locations in January 2018 for the same or substantially similar account access used as the basis for the Termination Notice.  The very same code was used 355 times across 52 locations in January 2019.  In February 2018, it was used 1,642 times across 83 locations.  All of the above figures were provided by Sprint without a single objection or complaint as to broad authorized used of the code to gain customer account access as deemed necessary.

58.     In the day(s) after receipt of the Termination Notice on March 19, 2019, Mobile Now learned that Sprint had been exchanging information with Brightstar US, Inc. ("Brightstar") as to the termination and its basis.

59.     Brightstar is a business partner of Mobile Now and an entity closely affiliated with Sprint.

---

[8] The term AR means "authorized representative."  The undersigned has simply used the term "distributor" throughout this Complaint though the terms AR, authorized representative, and distributor all have the same meaning.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030    TEL 703.273.8898    FAX 703.273.8897

Cameron | McEvoy
PLLC

60.     Mobile Now has since learned from sources within Sprint and Brightstar that the same day that Sprint issued the Termination Notice (i.e., March 19, 2019) Sprint relayed the allegations of fraudulent conduct and falsification of information to Brightstar.  In short, Sprint and Brightstar, two closely affiliated yet separate entities, are sharing false/defamatory termination rationale.  Mobile Now has also learned that Sprint representatives were publishing the defamatory statements to at least one other individual within the telecommunications industry whose identity is withheld for privacy reasons though who cited "fraud" and the specific contract provision relied upon by Sprint in its termination.

61.     In a further breach of its obligations, on March 26, 2019, Sprint's Director of Postpaid Dealer Channel (Mr. Scott Keen) notified Mobile Now that:

> Regarding the reconciliation of all amounts that may be due under the AR Agreement, Sprint is withholding all accrued but unpaid compensation in accordance with 15.1(A) and 15.2 of the AR agreement.  This includes the compensation payment originally planned for 3/29.[9]

62.     Mr. Keen's e-mail clearly constitutes a breach of the Sprint Agreement (to the extent the Agreement is even enforceable) and his admission that payment was due March 29 yet would not be paid, constitutes an admission of the breach.  When coupled with the recent actions of Sprint, it is clear the breach is intentional, incurable, and pursued in bad faith.  More specifically, again assuming for the sake of argument that Sprint's Agreement is even enforceable, Section 15.1 of the Agreement (by way of the Sprint Addendum) provides: "If this Agreement is terminated for cause by Sprint under Section 14.3 or 14.4 . . . then all

---

[9] Mobile Now also learned that Sprint shut-off Mobile Now's access to its "co-op" account sometime on or around March 19, 2019.  The "co-op" account is effectively a marketing account available to Mobile Now.  Why access was shut off prior to the termination date of April 18, 2019 is unknown and seems only explainable by an intent by Sprint to starve Mobile Now while also hoping that Mobile Now would limp along through April 18, 2019 to sell down any available inventory.

compensation stops immediately **on the effective date of the termination** or expiration." (emphasis added).  As Sprint is well aware, its Termination Notice of March 19, 2019 elected, for whatever reason, to delay the effective date of termination until 11:59 pm EST [sic][10] on April 18, 2019.  Thus, under the terms of the contract that Sprint drafted, compensation obligations do not stop and may not be withheld until 11:59 pm EST [sic] on April 18, 2019. Section 6.1 of the Sprint Agreement provides that: "Sprint will pay AR a monthly commission as provided for in Exhibit A-3."   Mr. Keen's email admits that the monthly commission for February was due on March 29.  This is also confirmed by Section 2.1 of Exhibit A to the Sprint Agreement which requires payments "by the last business day of the month following the end of the Measurement Period [i.e., March 29, 2019]."

63.     There are a number of additionally troubling aspects to Mr. Keen's email.  For example, it appears to rely upon Section 15 of the Sprint Agreement which by its obvious terms is a clause which does not apply until after termination ("Effect of Termination"), a date which still has yet to arrive.  In addition, he cites repeatedly to clauses which do not exist or appear improper.  For example, he cites to Section 15.1(A) as the basis for withholding the monies. Section 15.1(A) does not exist as it was deleted and replaced by way of Section 15.1 (without subparts) in the Sprint Addendum.  Mr. Keen also cites to Section 15.2 ("Liquidated Damages") which clearly does not apply (and clearly is not enforceable as drafted in any event). Presumably, Mr. Keen intended to cite to Section 15.3 of Sprint Agreement[11] but even that clause is problematic for various reasons and in any event it is controlled by the preceding clause

---

[10] Eastern Standard Time concluded on March 10, 2019.  Presumably, Sprint's Termination Notice intended to reference EDT ("Eastern Daylight Time").

[11] The numbering of certain clauses in the Sprint Agreement was changed by the Sprint Addendum.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030

TEL 703.273.8898   FAX 703.273.8897

Section 15.1 which states that the ability to withhold funds only applies as of the "effective date of the termination" which is still some two weeks away.

64.     Sprint's improper and wrongful termination, coupled with its improper/wrongful withholding of monies owed, constitute a material breach of the Sprint Agreement.  Moreover, its actions appear intentional and pretextual as part of a larger goal to put Mobile Now out of business (or as Mr. Cody Welker of Sprint stated in an email to Mobile Now of March 22, 2019, Sprint is intent on the "wind down of Mobile Now").

65.     As of the filing of this Complaint, in the approximately two weeks since Sprint issued its Termination Notice on March 19, 2019, Mobile Now has terminated all but a handful of employees totaling approximately 470 employees terminated, most of which were retail employees living paycheck to paycheck throughout the East Coast and Midwest.  As of the filing of this Complaint, Mobile Now will be forced to close the remaining 82 brick and mortar stores and shut down its ecommerce and phone sale portals, all of which will likely have ripple effect job loss.

66.     In short, Mobile Now appears to be the first major casualty of the T-Mobile-Sprint merger in what appears to be a coordinated scheme to shed stores.

67.     The evidence will show Sprint has, at all times, acted with malice and with total and reckless disregard for the rights of Mobile Now.

68.     All conditions precedent to filing this action have been satisfied by Mobile Now or otherwise waived, excused, or rendered meaningless by Sprint.

169911 - v1                                   18

## COUNT 1: BREACH OF EXPRESS CONTRACT

69.     Mobile Now incorporates and re-alleges the allegations of paragraphs 1–68 as though fully set forth herein.

70.     Sprint's failure to pay Mobile Now, as aforesaid, is without justification and constitutes a breach of contract.

71.     Moreover, Sprint's improper and wrongful termination of Mobile Now is not supported by the underlying contract and, as aforesaid, is without justification and constitutes a breach of contract.

72.     As a direct and proximate result of Sprint's breach(es), Mobile Now has sustained damages.

WHEREFORE, in consideration of the foregoing, Plaintiff Mobile Now, Inc. moves this Court to grant it the following relief:

a.      To enter judgment in its favor and against Defendant Sprint Corporation d/b/a Sprint Solutions, Inc. in the principal amount of Fifty Million Dollars ($50,000,000.00), plus pre- and post-judgment interest accruing at the statutory rate from as early as March 19, 2019, until paid, and for such other and further relief as deemed appropriate, including an award of its costs expended herein; and

b.      Such other and further relief as may be available under applicable law or contract.

### COUNT 2: BREACH OF IMPLIED CONTRACT – IN THE ALTERNATIVE TO COUNT 1

73.     Mobile Now incorporates and re-alleges the allegations of paragraphs 1–68 as though fully set forth herein.

74.     In the alternative to the express contract claim in Count 1, Sprint's conduct created a contract implied in fact.

75.     More specifically, Sprint requested and directed Mobile Now to provide certain services for Sprint, including resale of Sprint products and accessories ("Services"), in exchange for agreed commissions.

76.     Mobile Now agreed to, and did, fully perform the requested Services, as detailed through this Complaint, and prepared the Services as requested by Sprint and consistent with the course of conduct between the parties.

77.     The parties understood that Mobile Now was to be paid for its efforts.

78.     The Services conferred a direct and substantial benefit on Sprint.

79.     The reasonable value of the unpaid portion of the Services performed by Mobile Now for Sprint's benefit is not less than $10,000,000.00.

80.     Sprint is obligated to pay Mobile Now the reasonable value of the unpaid portion of the services performed by Mobile Now.

WHEREFORE, in consideration of the foregoing, Plaintiff Mobile Now, Inc. moves this Court to grant it the following relief:

a.     To enter judgment in its favor and against Defendant Sprint Corporation d/b/a Sprint Solutions, Inc. for the reasonable value of the Services of not less than $10,000,000.00, plus pre- and post-judgment interest accruing at the statutory rate from as early as March 19,

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030
TEL 703.273.8898   FAX 703.273.8897

Cameron | McEvoy
PLLC

2019, until paid, and for such other and further relief as deemed appropriate, including an award of its costs expended herein; and

b.    Such other and further relief as may be available under applicable law.

### COUNT 3: DEFAMATION

81.    Mobile Now incorporates and re-alleges the allegations of paragraphs 1–68 as though fully set forth herein.

82.    The aforesaid statements made in the Termination Notice (attached as Exhibit 3) were publications of an injurious falsehood about Mobile Now, accusing Mobile Now of fraud and falsifying information in its trade or business and resulting in the death of the company.

83.    The details of the Termination Notice were shared with (i.e., published to) at least one Brightstar employee who disclosed the publication to Mobile Now and in fact forewarned Mobile Now that it was going to be terminated by Sprint for "fraud."

84.    Brightstar responded to the defamatory publication by Sprint by closing its account with Mobile Now and effectively terminating its own business relationship with Mobile Now.

85.    Sprint issued the false statements on March 19, 2019 and shared those statements with Brightstar on or around the same day.

86.    It is also known that Sprint published the defamatory statements to at least one other individual within the telecommunications industry on or around March 19, 2019, who called Mobile Now representatives in surprise as to the allegations.

87.    In all likelihood the publications were not limited to the two instances of which Mobile Now is already aware.

169911 - v1

88.     Sprint published the statements with knowledge they were false and in reckless disregard for Mobile Now's rights.

89.     The aforesaid statements were knowingly false and malicious when made.

90.     The aforesaid statements constitute defamation *per se*, or if not defamation *per se* then they are actionable defamation in that they are calculated to shame and disgrace Mobile Now, and to hold it up to scorn, ridicule, or contempt.

91.     The circumstances of the publication and/or republication were such as to demonstrate that Sprint knew the statements were false when made, which demonstrates personal spite, ill will, hatred or a desire to hurt Mobile Now independent of the occasion on which the communication was made.

92.     As a direct and proximate cause of Sprint's conduct, Mobile Now has suffered significant harm to its reputation in the business community, harm to its overall business as a viable entity, embarrassment, and humiliation.

WHEREFORE, in consideration of the foregoing, Plaintiff Mobile Now, Inc. moves this Court to grant it the following relief:

a.      To enter judgment in its favor and against Defendant Sprint Corporation d/b/a Sprint Solutions, Inc. in the amount of Fifty Million Dollars ($50,000,000.00), plus punitive damages (to the extent recoverable) of such amount to be determined at trial but in no event less than treble any award of compensatory damages, reasonable attorney's fees as allowed by law, pre- and post-judgment interest accruing at the statutory rate from as early as March 19, 2019, until paid, and for such other and further relief as deemed appropriate, including an award of its costs expended herein; and

b.      Such other and further relief as may be available under applicable law or contract.

### COUNT 4: DECLARATORY JUDGMENT

93.     Mobile Now incorporates and re-alleges the allegations of paragraphs 1–68 as though fully set forth herein.

94.     An actual and justiciable controversy exists between Mobile Now and Sprint with respect to the validity of the dispute resolution obligations between the parties and perhaps other terms of contract documents between the parties.

95.     Mobile Now is entitled to a judicial determination declaring the contractual arbitration clause as invalid, unenforceable, or otherwise void for lack of mutuality such that the remaining claims should remain under this Court's jurisdiction.

WHEREFORE, in consideration of the foregoing, Plaintiff Mobile Now, Inc. moves this Court to grant it the following relief:

a.     To enter judgment in its favor and against Defendant Sprint Corporation d/b/a Sprint Solutions, Inc. declaring the contractual arbitration clause as invalid, unenforceable, or otherwise void for lack of mutuality, plus such other and further relief as deemed appropriate, including an award of its costs expended herein; and

b.     Such other and further relief as may be available under applicable law or contract.

4100 Monument Corner Drive, Suite 420, Fairfax, Virginia 22030

TEL 703.273.8898   FAX 703.273.8897

Cameron McEvoy
PLLC

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mobile Now, Inc. prays for the following relief against Defendant Sprint Corporation d/b/a Sprint Solutions, Inc.:

1.     All such relief requested by way of any *ad damnum* clause within each respective count stated above; and

2.     Such other and further relief as this Honorable Court deems equitable and just.


Dated:  April 2, 2019                 Respectfully submitted,


MOBILE NOW, INC.
By Counsel


/s/ Sean Patrick Roche
Sean Patrick Roche, Esq. (DC Bar No. 498623)
CAMERON/MCEVOY PLLC
4100 Monument Corner Drive, Suite 420
Fairfax, Virginia 22030
703-273-8898 (Office)
703-273-8897 (Fax)
sroche@cameronmcevoy.com
*Counsel for Plaintiff*


John Laughlin Carter, Esq. (*pro hac vice* application forthcoming)
CARTER HAYES, LLC
4115 Annandale Road, Suite 205
Annandale, Virginia 22003
(703) 658-7737
(703) 658-7736 (facsimile)
jlaughlinc@gmail.com
*Counsel for Plaintiff*